**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-851

ELIZA LUCERO

Plaintiff,

v.

CITY OF AURORA;

ANDREW SILBERMAN, Aurora Police Department Detective, in his individual capacity;

Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

**INTRODUCTION**

1.       On August 24, 2019, Aurora Police Department ("APD") officers Nathan
Woodyard, Jason Rosenblatt, and Randy Roedema murdered Elijah McClain, an innocent 23-year-
old Black man who was walking home from a convenience store.

2.       When news of Mr. McClain's murder broke, Eliza Lucero, a committed activist and
social justice leader, began helping to organize demonstrations calling for transparency surrounding
Mr. McClain's death. Ms. Lucero and her fellow protest leaders attended Aurora City Council
meetings and called on numerous public officials to investigate APD's role in Mr. McClain's death.
They organized press conferences demanding that APD's Chief of Police release video of the
incident. They organized demonstrations demanding justice for Mr. McClain and his family. This
activism helped spark the Justice for Elijah McClain movement.

3.　　In 2019, the City of Aurora and APD reacted to Ms. Lucero's advocacy with hostility. The Aurora City Council dragged its feet, then decided against opening an investigation into APD's murderous misconduct. The Adams County District Attorney refused to hold the officers accountable. Instead, Aurora stood behind Mr. McClain's killers, continuing to employ them as police officers. Instead of engaging with the fact that APD officers had murdered a gentle and peaceful Black man without cause, Aurora sought to cover up the officers' horrific conduct.

4.　　When Aurora refused to engage with the protestors' demands for police accountability, the public energy behind the movement fizzled. However, Ms. Lucero's commitment to truth and justice was unwavering. Then, on May 25, 2020, Minneapolis Police Officer Derek Chauvin murdered George Floyd, kneeling on his neck for nine minutes and 29 seconds while onlookers screamed that he was killing Mr. Floyd and begged him to stop. This began a national awakening concerning the scourge of police violence against Black people and injected new energy into the movement to get justice for Elijah McClain.

5.　　In the wake of George Floyd's murder, Ms. Lucero and her fellow protest leaders once again organized demonstrations seeking justice for Elijah McClain. Their goals were simple: to ensure that Mr. McClain's name was not forgotten, to create accountability for the officers who murdered him, and to force APD to change its ways so that horrific incidents such as what happened to Elijah McClain might stop occurring. Ms. Lucero and her fellow protest leaders again called on the Aurora City Council to launch an independent investigation into Mr. McClain's murder. They organized months of marches demanding justice. They organized a march the day of the violin vigil that was held to celebrate Mr. McClain's life. And Ms. Lucero and her fellow protest leaders organized a protest outside of APD's District 1 Station on July 3, 2020, where they called on then-Police Chief Vanessa Wilson to fire the officers who killed Mr. McClain.

6.      The protests worked. Responding to massive public pressure, the Aurora City

Council commissioned an investigation into Elijah McClain's death and APD's investigation of it.

This was a necessary initial step towards healing the rift between Aurora's government and its

residents. It also left APD with a choice: cooperate with the investigation and seek to correct any

problems it uncovered, or fight the investigation as hard as possible, including targeting the protest

leaders who dared to demand that Aurora tell the truth about what happened to Elijah McClain.

7.      APD chose the latter path. In response to the Aurora City Council's unanimous vote

to commission an investigation into APD's role in Mr. McClain's death, APD assembled a task force

with the explicit purpose of discrediting Ms. Lucero and her fellow protest leaders by concocting

criminal charges against them. APD marshalled massive resources behind this effort, including

dozens of police personnel, multiple detectives, and thousands of law enforcement man hours, all

dedicated to trying to arrest, prosecute, and imprison those who dared expose the truth behind

APD's murder of Elijah McClain and subsequent cover-up.

8.      Detective Andrew Silberman volunteered to lead the prong of APD's task force that

focused on the July 3, 2020 protest. Under his direction, task force officers spent hundreds if not

thousands of hours scouring surveillance video, body worn camera video, and social media to try to

generate criminal cases against Ms. Lucero and others. However, all they found was what was

obvious all along: Ms. Lucero broke no laws. She engaged in no misconduct. All she did was seek

accountability for the murderers employed by APD that APD was determined to protect.

9.      Despite knowing he had not uncovered probable cause to believe Ms. Lucero had

committed any crime, Detective Silberman pushed forward. He wrote a 33-page single-spaced

affidavit in which he attempted to portray Ms. Lucero as a cop-kidnapping terrorist who had

entrapped APD officers inside District 1. To do this, he omitted the most salient fact from his

affidavit, because he knew that if he included it, he would never get a warrant: the officers inside

District 1 on July 3, 2020 stayed inside not because they were trapped, but because they had been

ordered to remain inside by Chief Wilson and her chain of command. Armed with a warrant he

secured only through deception, Detective Silberman had Ms. Lucero arrested by a SWAT team,

incarcerated for eight days during the height of COVID, and initiated an unfathomable malicious

prosecution that threatened Ms. Lucero with decades in prison.

10.    As the preliminary hearing approached in Detective Silberman's baseless case against

Ms. Lucero, he and the prosecutors sought to find a way to make their concocted charges stick. On

March 5, 2021, four days before Ms. Lucero's preliminary hearing, Detective Silberman and the

prosecutors conducted a proffer interview with a person who had been at the July 3 protest, Trey

Quinn. Unfortunately for Detective Silberman, this proffer interview did not go as he had hoped.

Mr. Quinn was unequivocal: he did not like Ms. Lucero, but she had not done anything illegal.

11.    Detective Silberman then made an unforgivable choice. At the preliminary hearing

four days later, he lied under oath, pretending that his interview with Mr. Quinn just four days earlier

had not happened. Asked point blank about what interviews he had conducted, he perjured himself.

12.    Detective Silberman's perjury would likely have won the day had the preliminary

hearing concluded on March 9. However, by the end of that day the testimony was not complete,

and the hearing was continued until March 22. In the intervening weeks, the prosecution was forced

to disclose Mr. Quinn's interview, exposing Detective Silberman's lie. When the Court was

presented with Mr. Quinn's interview, it found that there was no probable cause for any charge that

was eligible for a preliminary hearing. The prosecution dismissed the remaining charges soon after.

13.    At the behest of his superiors at APD, Detective Silberman did everything within his

power to inflict as much pain as possible on Ms. Lucero and her fellow protest leaders for daring to

shine a light on some of the most horrific police misconduct our country has seen in recent decades. Both he and the City of Aurora will now face consequences for their actions.

## JURISDICTION & VENUE

14.     This is a civil rights action for monetary damages, declaratory relief, injunctive relief, and relief in the nature of mandamus, brought pursuant to 42 U.S.C. § 1983 and C.R.S. § 13-21-121.

15.     This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 2201-02. Ms. Lucero seeks attorney fees and costs. 42 U.S.C. § 1988; C.R.S. § 13-21-121.

16.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred in the State of Colorado, and all the parties were residents of and domiciled in the State at the time of the events giving rise to this Complaint.

## PARTIES

17.     Eliza Lucero is the plaintiff. At all relevant times, she was a resident of Colorado.

18.     City of Aurora ("Aurora") is a municipality in Colorado. Aurora enforces state and local law through its law enforcement agency, APD. At all relevant times, Aurora employed and was responsible for the direction, supervision, training, and discipline of APD officers, including Defendant Andrew Silberman.

19.     Andrew Silberman was, at all relevant times, a detective and a peace officer employed by Aurora. At all relevant times, Defendant Silberman was acting within the scope of his official duties and under color of state law in his capacity as an officer with APD.

## FACTUAL ALLEGATIONS

I.  **Beginning in 2019, Ms. Lucero helped organize protests seeking accountability for the APD officers who murdered Elijah McClain**

20.     On August 24, 2019, Elijah McClain was walking home from a corner store with an iced tea and listening to music. APD officers Woodyard, Roedema, and Rosenblatt grabbed him, forced him to the ground, and violently assaulted him. For the next 17 minutes, Mr. McClain begged for his life while these officers applied pain control techniques, torturing the handcuffed, prostrate, 143-pound, 23-year-old Black violinist. The officers repeatedly used carotid choke holds during this brutal assault. Their choke holds rendered Mr. McClain unconscious.

21.     Shortly thereafter, Aurora Fire Rescue ("AFR") personnel arrived. Two AFR paramedics, Jeremy Cooper and Peter Cichuiec, somehow decided Mr. McClain was a combative beast in need of taming rather than a terrified, small, passive Black man begging for his life. Mr. Cooper and Mr. Cichuiec falsely advised another paramedic that Mr. McClain was exhibiting signs of excited delirium and requested that this paramedic draw 500 milligrams of ketamine to tranquilize Mr. McClain. Mr. Cooper then injected those 500 milligrams of ketamine into Mr. McClain's body while APD officers held Mr. McClain down. Within seconds, Mr. McClain began taking labored, agonal breaths. APD officers and paramedics moved Mr. McClain to an ambulance. By the time Mr. McClain got there, he was not breathing and had no pulse. He never regained consciousness. Mr. McClain was pronounced brain dead on August 27, 2019, after several days on life support. He was taken off life support on August 30, 2019 and died that day.

22.     Shortly thereafter, Ms. Lucero and other activists began organizing direct actions to demand a public accounting of the events surrounding Mr. McClain's death.

23.     On October 7, 2019, Ms. Lucero and others led dozens of protesters in a peaceful assembly in front of the Aurora Municipal Center before a City Council meeting.

24.     Ms. Lucero then attended the City Council meeting where she stood with Mr. McClain's family, spoke out against police violence, and demanded that the City of Aurora conduct an independent investigation into Mr. McClain's death. She called on the City Council to release body camera footage of the incident. She demanded that Aurora pay the costs of Mr. McClain's funeral so that Elijah's mother could afford to bury her son. She called on APD to discipline the involved officers and remove them from the force. She demanded that the Adams County DA charge those responsible for killing Mr. McClain.

25.     Despite the efforts of Ms. Lucero and others, on November 22, 2019, Adams County District Attorney Dave Young announced his decision to clear Officers Woodyard, Rosenblatt, and Roedema of wrongdoing.

26.     Hours later, APD released the footage from the officers' body-worn cameras.

27.     In response to DA Young's announcement, on November 23, 2019, Ms. Lucero and others worked to organize an emergency protest at APD Headquarters.

28.     At that protest, Ms. Lucero and her fellow protest organizers demanded justice for Mr. McClain, called on APD to discipline the officers who killed him, and again called for an independent body to investigate Mr. McClain's death.

29.     Meanwhile, Aurora did everything in its power to ensure its officers escaped accountability. Despite having the body camera video, despite knowing exactly what Officers Woodyard, Rosenblatt, and Roedema had done – commit a literal murder – APD and the City of Aurora did nothing. Instead, the APD hierarchy kept officers they knew were killers on the force policing the people of Aurora.

II. **When Minneapolis police officers murdered George Floyd, Ms. Lucero helped organize the Colorado protests and sought justice for the APD officers who murdered Elijah McClain**

30.     On May 25, 2020, Minneapolis police officers murdered George Floyd. Derek Chauvin placed his knee on Mr. Floyd's neck and kept it there for nine and a half minutes, killing Mr. Floyd while his fellow officers looked on and stopped the outraged gathered citizens from intervening. A person in the assembled crowd recorded the incident. The shocking video sparked protests across the nation and began a national conversation about the scourge of police brutality.

31.     With national attention finally focused on this extremely important issue, Ms. Lucero and a dedicated group of protest leaders made a commitment: Mr. McClain would not be forgotten, and APD would not be allowed to sweep his death under the rug. Ms. Lucero and her fellow protest leaders resolved to reinitiate their campaign to seek justice for Mr. McClain and his family.

32.     Over the next several months, Ms. Lucero and her fellow protest leaders organized demonstrations and press conferences and waged a media campaign designed to force Aurora to reveal the truth about what happened to Mr. McClain and reckon with the fact that instead of seeking justice for Mr. McClain's killers, Aurora and APD tried to cover it up.

33.     After weeks of daily protests at the Colorado State Capitol, Ms. Lucero and her fellow protest leaders focused their attention directly on Aurora. They worked with Mr. McClain's family to organize a day of events to honor Mr. McClain's life, with Ms. Lucero helping organize a march to rally the public prior to the event that came to be known as Elijah McClain's Violin Vigil.

34.     On June 27, 2021, based on the organizing efforts of Ms. Lucero and others, thousands of people marched to the Aurora Municipal Center. They gathered on the lawn to hear from Mr. McClain's family, activists from local social justice movements, and others who were united in demanding change. They demanded transparency and accountability from APD. They also

8

gathered to play and listen to music created in honor of Mr. McClain, a violinist. The event attracted

extensive media coverage, putting further force behind Ms. Lucero and her fellow protest leaders'

demands for accountability and change at APD.

35.     As people gathered to listen to violin sonatas, the sound of Mr. McClain's favorite

music was interrupted by APD officers shouting commands into megaphones and threatening to

arrest people lawfully and peacefully assembled on the Aurora Municipal Center lawn.

36.     The assembled violinists and cellists continued playing as APD escalated its tactics,

encircling the thousands of people gathered on the lawn.

37.     APD officers clad in riot gear and armed with riot control weapons attacked this

peaceful celebration of Mr. McClain's life. They shot pepper-balls and sprayed noxious chemical

agents into peoples' faces from point blank range, injuring countless peaceful protestors who were

lawfully assembled and posed no threat to public order.

38.     The backlash against Aurora's heinous crackdown on peaceful protestors was swift

and fierce. Media coverage of APD's gestapo tactics went viral across the country, with national

media outlets reporting that APD had "terrorized an already reeling and grieving community."

39.     Aurora's brutal response galvanized further support for the protestors' goals, shining

an even brighter spotlight on Aurora's incomprehensible determination to resist any and all change

and to continue employing murderers to police the city. APD and the City of Aurora, on top of

facing accusations of murder and a corrupt coverup of that murder, now faced a PR disaster.

## III.     The July 3, 2020 protest and its aftermath

40.     On July 2, 2020, then-Chief of Police Vanessa Wilson announced that she had fired

three APD officers who had photographed themselves reenacting and joking about the carotid hold

their fellow officers had used in killing Mr. McClain.

41.     However, then-Chief Wilson refused to take action against the three officers who committed the murder.

42.     With APD's unconscionable leadership decisions compounding by the day, Ms. Lucero and her fellow protest leaders organized a demonstration for the next night. They took to social media, publicizing the demonstration demanding #JusticeforElijahMcClain. Their demands were clear: "Time's up, APD! Fire Roedema, Rosenblatt, & Woodyard NOW!"

43.     On the evening of July 3, 2020, several thousand protesters answered the call sent by Ms. Lucero and her fellow protest leaders. The assembled citizenry marched to APD's District 1 Police Station.

44.     Evidencing their commitment to nonviolent resistance, Ms. Lucero and her fellow protest leaders gathered the crowd outside of APD's District 1 Police Station and exhorted them to protest peacefully.

45.     Using megaphones, Ms. Lucero and her fellow protest leaders led chants calling on APD to fire the officers who murdered Elijah McClain.

46.     As the night went on, Ms. Lucero and those with whom she worked forcefully stated their demands while simultaneously working to keep the protest peaceful.

47.     Ms. Lucero discouraged the building of barricades.

48.     Ms. Lucero was explicit that the protestors should not attempt to tie the doors of the police station.

49.     As a seasoned and effective protest leader, Ms. Lucero knew that Aurora would seize any opportunity to try to make the media narrative be about unruly protestors.

50.     Based on this knowledge, Ms. Lucero told anyone who would listen that the protestors needed to be forceful in their demands yet peaceful in their actions.

51. During this demonstration, then-Chief Wilson and her chain of command at APD ordered the APD officers in the station to stay inside the station.

52. To avoid further negative media coverage, Chief Wilson ordered her officers not to confront the protesters.

53. Based on this decision, the protest proceeded peacefully outside of District 1. While a few people built barricades and put ropes around certain door handles, there was no violence and there was always an unblocked door for egress.

54. Ms. Lucero and her fellow protest leaders told the individuals taking these actions that building barricades and blocking doors was unhelpful and that they should stop.

55. The peaceful July 3, 2020 protest Ms. Lucero helped organize attracted extensive media coverage for the thousands of people it rallied in support of accountability for APD officers.

56. In combination with similar protests that came before and after, the protest leaders galvanized the community. The politicians of Aurora could no longer stand by and do nothing; the public pressure had become too great.

57. In direct response to the protests Ms. Lucero helped organize, on July 20, 2020, the Aurora City Council voted unanimously to commission an independent investigation into Mr. McClain's death.

58. The Aurora City Council's investigation vindicated Ms. Lucero and her fellow protestors, making clear that everything they had been saying about APD's killing of Elijah McClain and subsequent coverup were correct.

59. Although the Investigation Report and Recommendations did not attempt to assign legal responsibility to the officers who killed Mr. McClain, it concluded that the officers involved in Mr. McClain's death had used force on Mr. McClain within seconds of police contact, twice put him

in carotid holds, and had him injected with ketamine. The Report further found that "the post-event investigation was flawed and failed to meaningfully develop a fulsome record." Ultimately, the Report revealed that APD attempted to cover up its officers' murder of Mr. McClain:

> The Aurora Police Department's Major Crime/Homicide Unit investigation of the death of Mr. McClain raised serious concerns for the Panel and revealed significant weaknesses in the Department's accountability systems. First, the interviews conducted by Major Crime investigators failed to ask basic, critical questions about the justification for the use of force necessary for any prosecutor to make a determination about whether the use of force was legally justified. Instead, the questions frequently appeared designed to elicit specific exonerating "magic language" found in court rulings. Major Crime's report was presented to the District Attorney for Colorado's 17th Judicial District (the "District Attorney") and relied on by the Force Review Board, but it failed to present a neutral, objective version of the facts and seemingly ignored contrary evidence.

## IV. APD's despicable response to the Aurora City Council's investigation announcement

60. When the Aurora City Council announced its investigation into misconduct by APD officers in their interactions with Mr. McClain and investigation into his death, APD could have been chastened. It could have recognized the terrible errors it had made and vowed to cooperate with the investigation. Instead, APD decided to do the opposite.

61. Rather than admit any wrongdoing, APD resolved to go after the protest leaders.

62. In response to Ms. Lucero and her fellow protest leaders' success in moving the Aurora City Council to initiate an investigation into Mr. McClain's death, APD assembled a task force to investigate the leaders of the recent protests, including the one that occurred on July 3.

63. Detective Silberman volunteered for the job. As he later testified at Ms. Lucero's preliminary hearing:

> Q: You're aware that on July 20th, that was when, in response to the protest organized by our clients in these cases, Aurora decided to launch an independent investigation into the murder of Elijah McClain, correct?
> A: I believe that is the correct date.

Q: So in response to the City of Aurora launching an investigation into APD's conduct in the murder of Elijah McClain, APD's decision was to launch an investigation into the people who had brought awareness to APD's misconduct, correct?
A: That is correct. They decided to investigate the occupation.
Q: How was that (inaudible) communicated to you?
A: I was contacted by Sergeant Poppy [sic], he informed me that his is what the Department is trying to do, and asked me if I wanted to be part of the task force, and I said, yes.

64.     Having volunteered for the task force, Detective Silberman was assigned to lead the portion of the investigation that sought charges against the leaders of the July 3, 2020 protest.

65.     In service of this goal, APD gave Detective Silberman an incredible quantity of resources, including hundreds if not thousands of officer man-hours. APD effectively gave Detective Silberman a blank check to try to lock up the protest leaders who had dared to expose APD's extreme misconduct.

66.     Detective Silberman's task force officers scoured countless hours of surveillance and body camera video in search of any possible wrongdoing by a protester they could use to make an arrest and tarnish the credibility of the protest movement.

67.     In sum, in response to the City Council's announcement of its investigation, APD decided on a policy of attacking the protestors by any means available.

## V.     Detective Silberman's investigation did not uncover any illegal activity by Ms. Lucero

68.     Upon beginning his investigation into the July 3, 2020 protest leaders, Detective Silberman quickly learned that Ms. Lucero was one of them.

69.     Detective Silberman therefore set about trying to find any possible way to bring charges against Ms. Lucero.

70.     However, despite a massive investment of time and resources, the only thing
Detective Silberman's investigation revealed was that Ms. Lucero helped to lead a peaceful protest
that called on APD to fire the officers who had murdered Elijah McClain.

71.     After months of effort by Detective Silberman and the other task force officers,
Detective Silberman wrote a 33-page single-spaced affidavit detailing the supposed crimes Ms.
Lucero committed on July 3, 2020. At the end of this affidavit, Detective Silberman summarized the
entirety of Ms. Lucero's conduct that he had uncovered:

      a.  At 7:10 pm, Ms. Lucero walked at the front of a group of protestors.

      b.  At 7:42 pm, Ms. Lucero spoke to a group of protestors outside District 1.

      c.  At 10:21 pm, Ms. Lucero brought pizza and put it down outside District 1.

      d.  At some point, Ms. Lucero left the protest.

      e.  At 1:49 am, Ms. Lucero returned to the protest and had changed from pants into
shorts.

      f.  At 2:30 am, Ms. Lucero stood outside a door to District 1 for approximately two
minutes.

      g.  At various points during the protest, Ms. Lucero led protest chants.

72.     In his preliminary hearing testimony, Detective Silberman confirmed that the actions
listed in the previous paragraph were the only actions by Ms. Lucero that he had uncovered.

73.     Detective Silberman also confirmed that none of these actions led to any violence.

74.     Detective Silberman thus knew that, despite his extensive investigation, he had
uncovered no wrongdoing by Ms. Lucero. Quite to the contrary, Detective Silberman's investigation
revealed that Ms. Lucero had lawfully helped lead a protest.

75.     During his investigation, Detective Silberman also learned that the reason the officers inside District 1 stayed inside during the protest was that then-Chief Wilson had ordered them to stay inside.

76.     As Detective Silberman testified at the preliminary hearing:

Q: So, Detective, your understanding is that the officers inside police District One were ordered to stay inside the building?
A: Yes.
Q: By chain of command, or Chief Wilson?
A: Correct. I don't know, specifically, who.
Q: And at what time? Sorry.
A: 8:45 [pm].

77.     Fearing a repeat of the Violin Vigil debacle, then-Chief Wilson ordered the APD officers inside District 1 to remain there and not to engage with the protestors.

78.     Detective Silberman further learned that the officers inside District 1 had a large array of both lethal and non-lethal weaponry, as well as body armor to protect themselves.

## VI.     Despite knowing Ms. Lucero had committed no crime, Detective Silberman wrongfully initiated criminal proceedings against her, subjecting her to inhumane incarceration during the height of the COVID-19 pandemic

79.     Despite having uncovered no evidence that Ms. Lucero had committed a crime, Detective Silberman was determined to have her arrested and prosecuted for serious charges. To do this, Detective Silberman wrote a probable cause affidavit that intentionally omitted the exculpatory information he learned during his investigation.

80.     In Detective Silberman's affidavit, he sought to have Ms. Lucero arrested on the charge of Attempt to Commit First Degree Kidnapping, a class 3 felony, among other charges.

81.     At the time Detective Silberman wrote his affidavit, he knew that the reason the APD officers inside District 1 stayed inside was because they had been ordered to remain inside.

82.     Detective Silberman knowingly left this fact out of his affidavit.

83.     In doing so, he maliciously instituted criminal process against Ms. Lucero. This malicious prosecution threatened Ms. Lucero with decades in prison.

84.     Armed with an ill-gotten warrant, Detective Silberman and APD sought to serve it on Ms. Lucero in a way that inflicted the maximum amount of pain possible.

85.     First, despite knowing that Ms. Lucero had no history of violence and that his accusations against her amounted to having organized a political protest, Detective Silberman and APD had Ms. Lucero arrested by at least eight officers who swarmed her and her husband at their apartment, pinning her husband against a wall in a show of force.

86.     Second, Detective Silberman and APD had Ms. Lucero transported to the Van Cise-Simonet Detention Center in Denver after her arrest, despite knowing that the only charges against Ms. Lucero arose out of Adams County.

87.     At the time Detective Silberman submitted his baseless affidavit, COVID-19 was sweeping the country. No vaccines existed. No treatments existed. Deaths were constant and multiplying. Furthermore, jails were the epicenter of the pandemic, with the Van Cise-Simonet Detention Center being among the worst hotspots in the state.



### Colorado correctional facility outbreak figures

In late May, officials at Van Cise-Simonet Detention Center, Denver's largest jail, changed — without explanation — how they counted and reported their coronavirus cases to the state health department for tabulation in their "outbreak" file. The other correctional facility with a large number of cases, Sterling Correctional Facility, under the state Department of Corrections, did not change its counting method.

Chart: Evan Wyloge • Source: Colorado Department of Public Health & Environment • Get the data • Created with Datawrapper

88.     At the time APD and Detective Silberman orchestrated Ms. Lucero's arrest, the Van-Cise Simonet Detention Center was not transporting prisoners to other counties to prevent the transmission of COVID.

89.     Knowing this, APD and Detective Silberman ensured that upon Ms. Lucero's arrest she would be brought there.

90.     Because of this choice by Detective Silberman and SPD, rather than seeing a judge and immediately being released, Ms. Lucero would instead be incarcerated indefinitely in Colorado's most dangerous COVID hotspot.

91.     Ms. Lucero's first night in jail, the facility was so overcrowded she was forced to sleep on the floor in a cell with an obviously-ill cellmate.

92.     Ms. Lucero spent 8 days in the Van-Cise Simonet Detention Center in the early days of COVID before she was brought before a judge in Adams County and released.

93.     Ms. Lucero was held in her cell for a minimum of 23½ hours per day, and some days was let out of her cell for as little as five minutes.

94.     Detective Silberman and APD could have had Ms. Lucero transported to the Adams County Jail instead of the Van Cise-Simonet Detention Center. They chose not to in order to inflict maximum pain on Ms. Lucero.

**VII.    Detective Silberman perjured himself at the preliminary hearing in a failed attempt to continue his malicious prosecution of Ms. Lucero**

95.     Based on Detective Silberman's affidavit that omitted material exculpatory information – and which, even as written, did not establish probable cause that Ms. Lucero had committed any crime – a prosecution commenced against Ms. Lucero.

96.     In Adams County Case 20CR3418, the State of Colorado, relying on the assertions contained in Detective Silberman's 33-page affidavit, charged Ms. Lucero with Criminal Attempt to Commit First Degree Kidnapping, a class 3 felony that carried up to 32 years in prison as a possible penalty, two counts of Inciting a Riot, a class 5 felony carrying potential prison sentences of up to 6 years each, and two misdemeanors.

97.     Ms. Lucero's case was set for preliminary hearing, and after several continuances, the case was set to proceed to preliminary hearing on March 9, 2021.

98.     On March 5, 2021, just four days before the preliminary hearing, Chief Deputy District Attorney Tim Twining and Detective Silberman interviewed a witness who was present at the District 1 protest, Trey Quinn.

99.     During the interview, DA Twining and Detective Silberman asked Mr. Quinn about the activities of Ms. Lucero and her fellow protest leaders.

100.    Mr. Quinn's answer was clear: the barricades that were created at the July 3 protest were built by "white anarchist" groups, not anyone associated with Ms. Lucero. Further, when the white anarchist groups were building barricades, Ms. Lucero and her fellow protest leaders were calling on them to stop.

101.    Mr. Quinn also stated that Ms. Lucero and her fellow protest leaders played no part in tying doors shut.

102.    Detective Silberman learned from Mr. Quinn that Ms. Lucero and her fellow protest leaders "didn't ask [the white anarchist groups] to do it. They were explicitly on ground were expressing their distaste at it happening . . . when they saw how much was being blocked, then they were against it. They were against the building of barricades."

103.    Mr. Quinn's statements to Detective Silberman corroborated what Detective Silberman had learned during his investigation: Ms. Lucero had done nothing illegal.

104.    Mr. Quinn also made clear that he had no motive to help Ms. Lucero, and in fact had a motive to do the opposite. In the interview, Mr. Quinn was adamant that he did not like Ms. Lucero or her fellow protest leaders. During the over two-hour interview, Mr. Quinn disparaged Ms. Lucero and her fellow protest leaders at length. Mr. Quinn was not trying to help Ms. Lucero with his statements. He was just telling Detective Silberman what he observed at the District 1 protest.

105.    Four days later, Ms. Lucero's case proceeded to preliminary hearing.

106.    At that hearing, Detective Silberman was asked what interviews he had conducted during his investigation. In answering the question, Detective Silberman told a material lie:

> Q: You said eventually you were going to interview witnesses. Are you telling us you've interviewed zero witnesses as of today?
> A: I interviewed Officer Alcorta.
> Q: Other than Officer Alcorta, did you interview anyone else?
> A: I have not, no.

107.    Despite having interviewed Mr. Quinn just 4 days before Ms. Lucero's preliminary hearing, Detective Silberman lied about having conducted the interview.

108.    By lying about having interviewed Mr. Quinn on March 5, Detective Silberman prevented Ms. Lucero's counsel from learning of and adducing Mr. Quinn's statements so the Court could consider them in its probable cause determination.

109.    In so doing, Detective Silberman intentionally misled the judge responsible for determining the existence of probable cause so as to raise the chances of succeeding in his baseless and malicious prosecution of Ms. Lucero.

110.    Unfortunately for Detective Silberman, Ms. Lucero's counsel learned of Detective Silberman's deception while Ms. Lucero's preliminary hearing was still pending.

111.     As it turned out, the parties did not have enough time to complete the preliminary hearing on March 9, 2021, so the hearing was continued to March 22. In the interim, the prosecution was forced by its discovery obligations to disclose the video of Mr. Quinn's interview, alerting Ms. Lucero to Detective Silberman's perjury. But for this fortuitous circumstance, Ms. Lucero would not have learned of Detective Silberman's perjury in time to present Mr. Quinn's statements to the preliminary hearing court. In the absence of the exculpatory information Detective Silberman tried to conceal from the court, Ms. Lucero's kangaroo case may well have proceeded, with the judge binding over Detective Silberman's fabricated charges.

112.     On March 22, 2021, Ms. Lucero presented Mr. Quinn's statements to the court at her continued preliminary hearing.

113.     After learning of Mr. Quinn's statements and after considering the lack of evidence against Ms. Lucero, the Court found that there was no probable cause to support the attempted kidnapping charge, the only charge that was the subject of the preliminary hearing.

114.     Further, the preliminary hearing judge stated that in his opinion based on the evidence he had heard, there was not probable cause to support any of the charges against Ms. Lucero and the warrant for that charge should never have been issued.

115.     A short while later, the prosecution dismissed the remaining charges.

116.     APD and Detective Silberman marshalled enormous resources to silence, malign, and incarcerate Ms. Lucero for daring to expose the truth about what APD did to Mr. McClain.

117.     The investigation commissioned by the Aurora City Council would never have been initiated without Ms. Lucero's deeply necessary and fundamentally patriotic commitment to the truth. That investigation revealed that everything Ms. Lucero and her fellow protest leaders has been saying was true.

118.    Mr. McClain was murdered by APD officers.

119.    These officers have now been charged and are being prosecuted for homicide.

120.    Once Ms. Lucero's charges were dismissed, she alerted APD to Detective Silberman's perjury.

121.    In a letter, she laid out in explicit detail the false, material statements Detective Silberman made under oath to try to preserve his failing prosecution of Ms. Lucero.

122.    Though she did not expect it, Ms. Lucero hoped that APD would act on the clear evidence of Detective Silberman's felonious misconduct.

123.    APD refused to even investigate the fact that one of their detectives provably lied under oath.

## VIII.    Ms. Lucero and her fellow protest leaders organized some of the most important speech in Colorado's recent history

124.    If it weren't for Ms. Lucero and her fellow protest leaders, Officers Woodyard, Rosenblatt and Roedema would still be APD employees. Worse, they would have been emboldened by having gotten away with murder with the help of their employer.

125.    Ms. Lucero and her fellow protest leaders' sustained activism sparked necessary reforms designed to hold police officers accountable for violating individuals' rights.

126.    Aurora's response was to try to silence this speech by any means necessary.

127.    APD and Detective Silberman mobilized the full power of the state to have Ms. Lucero thrown in jail under horrific conditions and threatened with decades in prison for daring to demand truth and justice.

128.    Aurora, APD, and Detective Silberman will now be held accountable for their egregious misconduct.

**IX.    Aurora is responsible for Detective Silberman's conduct because Aurora reviewed and approved it every step of the way**

129.    After Detective Silberman completed his investigation into Ms. Lucero and had written a draft of his probable cause affidavit seeking a warrant for Ms. Lucero's arrest, he sent the affidavit to the higher-ups in the APD chain of command for review and approval.

130.    Detective Silberman's probable cause affidavit was reviewed and approved by either then-Chief Wilson or her designee.

131.    Based on a review of the proposed probable cause affidavit, then-Chief Wilson or her designee was aware that Detective Silberman had omitted from his affidavit the fact that the reason APD officers stayed inside District 1 on the night of the July 3, 2020 protest was that they had been ordered to do so by then-Chief Wilson and her chain of command.

132.    Knowing about this material omission, then-Chief Wilson or her designee nonetheless approved using Detective Silberman's affidavit to initiate a prosecution of Ms. Lucero.

133.    Through this action, the final decisionmaker for Aurora chose to approve moving forward with the prosecution of Ms. Lucero despite knowing that the affidavit seeking her arrest omitted a material fact, where including the material fact would have vitiated probable cause.

134.    Through this action, the final decisionmaker for Aurora chose to approve moving forward with the prosecution of Ms. Lucero despite knowing that the affidavit, even as written, did not establish probable cause to believe that Ms. Lucero had committed any crime.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Colo. Rev. Stat. § 13-21-131; Colorado Constitution, article II, section 7**
**Malicious Prosecution**
**(Against Defendant Silberman)**

135.    Ms. Lucero incorporates all other paragraphs as if fully set forth herein.

136.    Ms. Lucero had a protected right under article II, section 7 of the Colorado

Constitution not to be subjected to a malicious prosecution.

137.    Detective Silberman contributed to Ms. Lucero being subjected to a prosecution.

138.    That prosecution terminated in Ms. Lucero's favor.

139.    There was no probable cause to support the prosecution.

140.    Detective Silberman acted with malice, as described herein.

141.    The prosecution caused Ms. Lucero to suffer damages, as detailed herein.

### SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983; Fourth Amendment**
**Malicious Prosecution**
**(Against Defendant Silberman and Aurora)**

142.    Ms. Lucero incorporates all other paragraphs as if fully set forth herein.

143.    Ms. Lucero had a protected right under the Fourth Amendment not to be subjected

to a malicious prosecution.

144.    Detective Silberman caused Ms. Lucero's prosecution.

145.    That prosecution terminated in Ms. Lucero's favor.

146.    There was no probable cause to support Ms. Lucero's arrest, confinement, or

prosecution.

147.    Detective Silberman acted with malice, as described herein.

148.    As described herein, Aurora established a policy and practice to target people who

had helped organize protests related to the death of Elijah McClain for investigation and prosecution.

149.    Detective Silberman's actions described herein were conducted pursuant to this policy and practice, at the direction of Aurora. Aurora thereby caused Detective Silberman to engage in a malicious prosecution of Ms. Lucero.

150.    By establishing the task force to target protest leaders, giving the task force tremendous resources to target the protest leaders, approving the initiation of a prosecution of Ms. Lucero even when this enormous resource expenditure failed to uncover evidence of illegal activity by Ms. Lucero sufficient to establish probable cause, and approving initiating the prosecution of Ms. Lucero with an affidavit that Aurora knew omitted material facts that, if included, would have vitiated any hypothetical arguable probable cause, Aurora acted with a sufficiently culpable mental state to be held liable.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including but not limited to:

a.    Declaratory relief and injunctive relief, as appropriate;

b.    Actual economic damages as established at trial;

c.    Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses, as established at trial;

d.    Punitive or exemplary damages for all claims as allowed by law in an amount to be

determined at trial;

e.     Issuance of an Order mandating appropriate equitable relief, including but not

limited to: The imposition of policy changes and training to prevent future similar

misconduct by Defendants;

f.     Pre-judgment and post-judgment interest at the highest lawful rate;

g.     Attorney's fees and costs; and

h.     Such further relief as justice requires.


**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**


Dated: April 5, 2023


*/s Adam Frank*
Adam Frank
Cameron Bedard
Frank Law Office LLC
1133 N Pennsylvania St.
Denver, CO 80203
Phone: (303) 800-8222
Fax: (303) 800-9122
adam@franklawoffice.com
cameron@franklawoffice.com
*Attorneys for Ms. Lucero*